[No. 2994.]

## Bent. Elam *v.* The State

1. Practice in the Court of Appeals—Charge of the Court.—In previous decisions of this court the doctrine has been advanced that convictions would not be set aside because of errors or omissions in the charge not sought to be corrected by exception or special charge, nor by being made ground of motion for new trial, unless the error was fundamental. Such doctrine, however, is not altogether correct. The true rule in such state of case is this: If there was a material misdirection of law as applicable to the case, or a failure to give in charge to the jury the law which was required by the evidence in the case, and such error or omission was calculated, under all the circumstances of the case, to prejudice the rights of the defendant, this court should, for either cause, reverse the judgment.

2. Same—Evidence.—The application of the rule stated, in all cases wherein it can be invoked, is controlled absolutely by the character of the evidence adduced on the trial. Whether or not it tends sufficiently to the establishment of a defense, or a mitigation of the offense, as to reasonably demand a charge, is a question primarily committed to the sound discretion of the court below, and then to this court on appeal. If its force is deemed very weak, trivial, light, and its application remote, the court should not charge upon it. If, however, it is so pertinent and forcible that it might, in reason, be expected to influence the jury in reaching a verdict, the court should so charge as to furnish them with the appropriate rule of law upon the subject. Note in this case the

defense set up, and evidence *held* not to be of such a character as to de-
mand a charge, in the absence of exception or requested instruction.

3. THEFT—FACT CASE.—See evidence *held* sufficient to sustain a conviction
for horse theft.

APPEAL from the District Court of Dallas. Tried below be-
fore the Hon. G. N. Aldredge.

The conviction was for the theft of a horse, the property of
Clark Kendall, in Dallas county, on the third day of May, 1881.
The penalty imposed by a verdict of guilty was a term of five
years in the penitentiary.

Clark Kendall was the first witness for the State. He testified
that in April and May, 1881, he was the owner of a certain bay
mare, branded 12 on the left shoulder, which was his brand. In
the fall of that year he found his mare in the possession of
Charles C. Williams. The witness had never consented that the
said Williams or any one else should take the said mare, nor
had he ever sold that mare to any one. When witness found
the mare in the possession of Williams he learned for the first
time that the defendant had traded her to Mr. Williams. Wit-
ness made the necessary proof and recovered her. This was in
the fall of 1881. Prior to her loss the witness had ridden the
animal about the poor farm, where he was a guard. It is true
that during the fall of 1880 and the winter of 1881, the witness
was addicted to strong drink, and frequently drank to excess.
He often got on "big sprees" in Dallas, and sometimes would
stay on them for weeks. He had often been arrested and con-
fined in calaboose for drunkenness. However, he never failed
to remember everything he did while drunk. The witness did
not sell two horses, nor the mare charged to have been stolen,
in Underwoods's saloon, on Main street, in Dallas, in the latter
part of December, 1880, or in January or February, 1881. He
never at any time in Underwood's saloon sold this animal to
defendant, in the presence of Bob Pearson, Jim Hunnicutt, H.
H. Dickey and J. J. Pratt. No conversation involving the sale
of this animal ever occurred between witness and the defend-
ant at that time and place, or any other time and place. Wit-
ness had never sold or authorized the defendant to take up and
use the mare, or in any way to interfere with his possession of
the animal. The witness was much confined to his bed by seri-
ous illness during the spring and summer of 1881, and for that

reason did not learn of Williams's possession of the mare under purchase from the defendant. As soon as the witness recovered and learned that his mare was in the possession of Williams, he made the necessary affidavit of ownership. Williams thereupon notified defendant that witness claimed the animal. The defendant took no steps whatever to protect Williams's claim under his purchase, and Williams then surrendered the mare to the witness. The defendant interposed no objection at this time, and set up no claim, but on the contrary, when witness recovered possession of the mare, the defendant offered to purchase her from witness for forty dollars.

Charles C. Williams was the next witness for the State. He testified that he acquired possession of the animal described in the indictment by trade with the defendant on or about the third day of May, 1881. He gave the defendant another horse for her. She was branded with the figure 12 on the left shoulder and the left hip. The defendant told the witness at the time of that trade that the mare was his, that he had raised her on the range with Mrs. Hunnicutt's horses, and that the 12 brand was his. The witness did not remember the exact date of the trade, but it was sometime in the spring of 1881. Clark Kendall afterwards claimed the mare as his property, and proved his title to her, and in the fall the witness surrendered her to the said Kendall. Witness notified the defendant of Kendall's claim and recovery, and defendant said that he would make it all right with the witness, and went to Dallas next day ostensibly to see Clark Kendall about the matter. The defendant, after this trade, traded off the horse he got from witness in exchange for the mare, and had never fully paid the witness for his horse. The trade between the witness and the defendant was made in the daytime, and at the defendant's house. Witness and defendant drove the mare up from the range in Dallas county, in company with two of witness's horses which had strayed off, and which had been posted by the defendant. It was one of these recovered estrays that witness traded to defendant for the mare. No one but witness and defendant were present when this trade was made. Defendant had kept the mare hitherto openly, and with no concealment, so far as the witness knew. The witness was positive that, at the time of the trade, the defendant told him that the 12 brand was his. The witness was on Mesquit creek on the day of the trade, before it was made. He there met the defendant and learned that he had posted two of his,

witness's, horses. Witness went with him home, and the trade was then made as above stated. After Kendall claimed the mare, and witness called on defendant about the matter, the defendant did not deny Kendall's title. At this point the State closed.

Bob Pearson was the first witness introduced by the defendant. He testified that late one evening in January or February, 1881, the defendant, J. J. Pratt, Jim Hunnicutt and his brother, old man Dickey, Clark Kendall and others, were in Underwood's saloon, on Main street, in the city of Dallas, where the defendant was keeping bar, and was then on watch. Clark Kendall was on a spree, but was not at the time very drunk. He had been on that spree and about that saloon for several weeks. The defendant and Kendall, on the occasion referred to, got to talking about horses. Kendall said to defendant: "Bent., let me sell you the two ponies." Defendant replied: "I have no use for them, and moreover I haven't the money to buy them." Kendall said in reply: "You can buy them without the money; go and get them, and in the spring pay me what such stock is worth." He may have said: "Pay me what you get for them." The defendant then called for pen, ink and paper to write bills of sale. Witness then said: "I have no ink. I have a pencil, but a bill of sale written with a pencil is not good." Pratt then spoke up and said: "A bill of sale is unnecessary when you have witnesses." The witness did not know who was the first to broach the subject of a trade. The witness was in no way related to the defendant, and had no interest in the result of this trial. He did not know to whom he had talked about this case. He had talked to E. G. Bower. This was just before he went upon the witness stand. The witness could not remember the names of all the parties in the saloon at the time of the trade, but remembered the two Hunnicuts, Pratt, Dickey, the defendant and Kendall. He knew that the defendant had been engaged in stock and cattle trading for a number of years. He had seen defendant make other trades for stock. He knew of no reason why he remembered the particulars of this trade.

Jim Hunnicut was the next witness for the defendant. He testified that he was present in Underwood's saloon at the time of the trade between defendant and Kendall, and he gave in detail the same account of that transaction as that given by the witness Pearson. Witness's brother was not in the saloon at that time. Dickey and Pratt were. Witness was in no way re-

lated to the defendant, and had no interest in the issue of this trial. Witness was related to certain persons who were relatives of the defendant. Witness had told no one that he saw the trade until the day of this trial. He knew of no reason why he particularly remembered this trade. He knew that the defendant, at the time, was a trader in stock, and knew of other stock trades he had made. Kendall may have had a drink or two on that occasion, but was not drunk.

H. H. Dickey testified, for the defense, that at one time he was a member of the police force of the city of Dallas. He was passing Underwood's saloon sometime in the winter of 1881, and saw the defendant and Clark Kendall in that saloon. They were then talking about a horse trade. Witness knew nothing particular about the trade, but heard something said about a bill of sale. He then left. Kendall and defendant were both drinking. Kendall at no time told the witness that he had sold the ponies to the defendant.

Henry Waller testified that he was at present, and was in 1880 and 1881, a member of the police force of the city of Dallas. He knew both the defendant and Clark Kendall. He had several times arrested Kendall for drunkenness. Kendall was very wild when on a spree, and would shout and make much noise. When drunk it was impossible to keep him from yelling. When on a big drunk Kendall would lose all control over his mind, and would know nothing that he would do. He used to drink very hard.

Pat Mullen testified that he was a policeman. He had often arrested Clark Kendall for drunkenness and confined him in jail. Kendall used to get on very hard drunks, and when in that condition he would know nothing of what, during the time, he would do, and when sobered could remember very little of anything that transpired during his sprees.

The motion for new trial, setting up various grounds not considered in the opinion, was overruled, and notice of this appeal entered.

*H. Barksdale* and *E. G. Bower*, for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. Two grounds are relied on for a reversal of this judgment. 1. That the charge of the court to the jury is

not sufficiently full, there being a feature of the case presented by evidence to which the law was not applied. 2. That the verdict of the jury is against the weight of the evidence, and that therefore the court below should have granted a new trial.

Counsel for defendant concede that the charge of the court, to the full extent to which it goes, is without objection; the only complaint being that it did not extend to and apply the law to a certain phase of the case, which has support in evidence. There was no objection urged to the charge as given; no instruction was requested of the court, nor was any complaint made of the charge in the motion for new trial. This being the case, the writer, prior to the argument of counsel for the defendant in this case, entertained the opinion, and may have expressed it in former opinions, that for this court to revise a charge, the error therein must be fundamental. In this view we were wrong, owing to a misapprehension of the opinion in the case of *Bishop* v. *The State*, 43 Texas, 309. This subject being most thoroughly reviewed and discussed in the argument of counsel for the appellant, we are now convinced that, though no objection was made to the charge at the time, nor instruction requested which, if given, would have made the charge full and complete, covering each and every phase of the case required by the evidence; and though there was no complaint in the motion for new trial that the charge was not full and complete, and although the omission or error therein was not fundamental, still this court has the power to revise the charge, and under certain circumstances will reverse the judgment.

The error not being complained of at any time or stage of the trial below, by what rule is this court to be governed in determining whether such error will warrant the reversal of the judgment?

The rule we believe to be this: If there be a material misdirection of the law as applicable to the case, or a failure to give in charge to the jury the law which was required by evidence in the case, and the affirmative error, or the omission, is calculated, under all the circumstances of the case, to injure the rights of the defendant, this court should, for either of these errors, reverse the judgment.

But in all such cases as this—a case in which there was no complaint of the charge below—this vital question presents itself: Does the evidence, or any evidence in the case, tend

sufficently strongly to the establishment of the defense as to require a charge applicable thereto? Upon this subject Chief Justice Roberts, in *Bishop* v. *The State*, 43 Texas, 390, says: "When the evidence tends sufficiently to the establishment of a defense, or mitigation of the offense charged, as to reasonably require a charge as applicable, is a question of sound judgment to be exercised by the district judge in the first instance, and by this court on appeal. If its force is deemed to be very weak, trivial, light, and its application remote, the court is not required to give a charge upon it. If, on the other hand, it is so pertinent and forcible as that it might be reasonably supposed that the jury could be influenced by it in arriving at their verdict, the court should charge so as to furnish them with the appropriate rule of law upon the subject."

It will be seen from this that a failure to charge the law applicable to a defense will not necessarily result in a reversal of the judgment. There may be evidence tending to present a certain defense, and yet its force may be so "weak, trivial, light, and its application so remote" that a failure to charge upon it will not require a reversal of the judgment. On the other hand, if the evidence tending to present such defense is so "pertinent and forcible" as that it might be reasonably supposed that the jury could be influenced by it, the law applicable to such defense should be applied, and a failure to do so would require a reversal of the judgment; for the extent of the injury to the defendant resulting from a failure to charge the law, or whether defendant be at all injured by such failure, depends upon the pertinency and force of the evidence to raise the defense. If the evidence be pertinent and sufficiently strong for it to reasonably appear to this court that the jury may have acted thereon and acquitted the defendant, if the law applicable to the case had been given in the charge to the jury, the injury referred to would appear from the record, and this court would reverse.

If, however, this evidence be so "weak, trivial, light, and its application so remote" as not to render it reasonable to suppose that the jury would, if the law applicable thereto had been charged, be influenced thereby, clearly this court would not reverse the judgment.

The question upon which this appeal must turn, therefore, is this: Is there a defense presented by evidence which is sufficiently pertinent and strong "as that it might be reasonably

○

supposed that the jury could be influenced by it in arriving at their verdict," in regard to which the court below failed to apply the law? In determining this question we would remark that all of the facts in the case, whether bearing upon the defense in regard to which the omission in the charge is alleged or not, must be looked to.

In relation to what matter, or defense, in this case did the court fail to apply the law? This requires a statement, and that of the appellant will be adopted. It is: "Appellant's defense was that he had purchased the horse alleged to have been stolen by him, of the owner, and had authority to sell or dispose of the horse. The court charged the jury that if they believed from the evidence the owner sold the horse to appellant, or had a reasonable doubt on the question, they should acquit."

It is insisted that this charge is not sufficiently full, in that it fails to apply the law to the following phase of the case, to wit: That though Kendall, the owner, did not sell the horse to defendant, yet if he, defendant, honestly and in good faith believed that there was a sale, and in pursuance of this belief took the horse from the range and disposed of the same, he would be guilty of no offense. The facts relied upon by the defendant by which this defense is presented are contained in the statement above and the following: "The testimony shows that the owner of said horse was an habitual drunkard; that by the excessive use of whiskey his mind had become impaired and his memory very defective; that just previous to the alleged sale of the horse he had been on a long drunken spree and debauch, and was then and had been suffering with paralysis."

Now, as we have stated above, there is no complaint of the charge because of misdirection of the jury, but because the court failed to apply the law to all the different phases of the case, or the different state of facts under which, if believed by the jury, they would have probably acquitted defendant. And it must be borne in mind that there is no objection to the charge of the court relating to the purchase, so far as it went. The objection is that the jury may have believed from the evidence that the transaction sworn to by defendant's witnesses actually occurred, and still in law there was no sale because of the mental imbecility of Kendall, arising from the excessive use of whiskey; and that therefore the court should have charged the jury that, though they may not believe from the evidence that Kendall was capable of making a contract, yet, if defendant

believed him capable, and, acting upon this belief, purchased, and, in pursuance of the purchase and belief, took and disposed of the horse, he would not be guilty. This is a correct proposition, and, if presented by evidence which is pertinent and sufficiently strong as to reasonably suppose that the jury could be influenced by it in arriving at their verdict, the court should have charged so as to furnish them with the appropriate rule of law upon the subject.

The question, therefore, is, what evidence in this record presents this issue? The testimony of defendant's witnesses rather tends to negative than to raise this defense—the witnesses to the sale. Pearson says Clark Kendall was on a spree, but was not very drunk at the time. Hunnicut states that Kendall was not drunk the day he made the trade with defendant, although he may have had a drink or two. Dickey says that Kendall and defendant were both drinking. These witnesses, Pearson, Hunnicut and Dickey, depose to the trade or sale, and certainly it will not be contended that the evidence tends to raise the issue as to the mental imbecility of Kendall. That he was drinking may be conceded, but evidently from their evidence Kendall was competent mentally to make a binding contract. There was nothing in his conduct, or in what he said at the time, tending in the slightest degree to question his capacity to contract.

It is true that Waller and Mullen state that when on a spree, like other men similarly situated, Kendall did not know what he was doing, and could not remember what had occurred while in this condition. This evidence, it may be conceded, tends to raise the presumption that this was his condition when the sale was made, but the question arises, with what force does it thus tend? Has it that pertinency and force which would render it reasonable to infer that the jury would have been influenced by it in arriving at their verdict, if the law applicable thereto had been given in charge? We are of the opinion that it has not. On the other hand, we believe that notwithstanding there is evidence tending to present this defense, still its pertinency and force are so remote and weak that a failure to charge the law applicable to this defense worked no injury to the rights of defendant. We are not to be understood as holding that if the omission complained of had been excepted to at the time, or sought to be cured by the proper charge, that this court would not reverse.

The second ground relied upon for a reversal is that the verdict is against the weight of the evidence. We will not discuss the question so ably argued by counsel for defendant in regard to the right of this court to reverse a judgment because the verdict is against the weight of the evidence, for we are of opinion the verdict in this case is amply supported, not only by the evidence but by the great preponderance of the evidence. What are the facts? That defendant took from the range the mare of Kendall and sold her to Charles Williams. This mare was plainly branded 12; when he sold her to Williams defendant "told him that the 12 was his brand, and that he had raised the mare." It is not contended that this was true, but it is conceded to be false. If, then, Williams swore the truth, defendant, at a time when an honest man ought to tell the truth, was guilty of a deliberate falsehood. How, we ask, does this conduct—this falsehood uttered at such a time—comport with the fact that he had purchased the mare from Kendall, the legal owner? If in fact this transaction actually occurred, what necessity for this deliberate falsehood? The truth would have served the same purpose, and if Williams had been unwilling to rely upon Elam's statements, Pearson, Hunnicut and Dickey could have established his right to the mare.

How terribly cogent this conduct under the circumstances of this case! But stranger, if possible, than this fact, is the fact that when Kendall claimed the mare Williams notified Elam of the fact, and he stated that he would make it all right, and went to Dallas to see Kendall, but as stated by Williams. "Elam did not deny Kendall's title to the mare in question, which I bought from him, after Kendall made the affidavit claiming her." Here again, under the most pressing circumstances, strange to say no allusion whatever was made by defendant to the purchase from Kendall. These facts were all before the jury, and by the charge they were called on to say whether or not the defendant purchased the mare from Kendall, and having determined this issue against the defendant, we will not disturb their finding.

We have found no such error in this record as will justify this court in disturbing the judgment, and it is therefore affirmed.

*Affirmed.*

Opinion delivered April 19, 1884.